Sosman, J.
Plaintiffs brought the present action complaining of the decision of the Department of Social Services (DSS) to support allegations of neglect made against both of the Hills and to list them on DSS’ Central Registry as alleged perpetrators of neglect. After review of the administrative record, the court affirms the agency’s decision.
Facts
Plaintiffs were foster parents for three children placed with them by DSS, and also raised four of their own children. One of the foster children placed with the Hills was the nephew of Mrs. Hill (“Jack”).[1] “Jack” was fifteen years old when he was first placed with the Hills in 1989.
Shortly after “Jack’s” arrival, the Hills learned that “Jack” had sexually assaulted his prior foster mother and that he had sexually abused other foster children in his earlier placement. By the fall of 1989, “Jack” was starting to assault Mrs. Hill. While various professionals involved with Jack’s case recommended other forms of placement and treatment for “Jack,” the Hills advocated that he continue to be placed with them.[2] Ultimately, DSS decided that “Jack” would remain in his placement -with the Hills.
Mrs. Hill reported to DSS social workers that “Jack” was sexually acting out and engaging in inappropriate behavior with her. Although DSS workers indicated that they were not told of the details of these episodes, the record is clear that DSS was generally aware of “Jack’s” sexual problems and that those problems continued throughout his placement with the Hills.[3] Despite that awareness, DSS placed three foster children in the Hill home during the time that “Jack” was also placed there.
Although the Hills claimed that they did not allow “Jack” to be home alone with the other children, “Jack” himself reported that he would babysit for the children. When interviewed, one of the children (age five) referred to “Jack” babysitting for them when Mrs. Hill was out of the house.
The Hills instituted various methods to try and prevent “Jack’s” inappropriate sexual activity. The Hills had “Jack’s” therapist meet with the other children; they implemented a “contract” with “Jack” that was focused largely on control of his sexual impulses; they arranged for “Jack” to sleep in his grandmother’s apartment downstairs;[4] and a lock was placed on the bedroom door of the Hills’ teenage daughter.
The steps taken by the Hills proved ineffective. “Jack” did not abide by the contract. Despite the requirement that he spend the night at his grandmother’s apartment, “Jack” frequently returned to the Hills’ apartment during the night.
In February 1992, following another sexual attack on Mrs. Hill, “Jack” was removed from the Hills’ home.[5] At that time, Mrs. Hill also reported that “Jack” had sexually abused her five-year old daughter. When interviewed, that child also reported sexual abuse of one of the foster children by “Jack.”
Procedural Background
On March 16, 1992, a DSS social worker filed a report of sexual abuse of “Jack” by Regina Hill pursuant to G.L.c. 119, §51A. The report described that Mrs. Hill had “allowed” “Jack’s” sexual contacts to occur and that the Hills had “allowed” “Jack” to remain in the home. The report also mentioned a concern about “Jack’s” possible sexual abuse of the five-year-old girl in the house and “the parents not being able to appropriately protect their children.”
On March 20, 1992, DSS determined that the allegations of neglect and sexual abuse were “supported” in that there was “reasonable cause” to believe that Mrs. Hill had “engaged in inappropriate sexual behaviors” with “Jack” for over two years and “reasonable cause” to believe that the Hills had neglected the other children and foster children.[6] Accordingly, DSS listed the Hills on its Central Registry as perpetrators of neglect and abuse.[7]
The Hills then requested an administrative hearing with respect to the decision to support the report and list them on the Central Registry. See 110 CMR 10.00 et seq. A hearing was held on June 26, 1992. On July 27, 1992, the Administrative Hearing Officer issued his decision, reversing the decision to support the report with respect to both neglect and abuse. The *64 Hearing Officer found that Mrs. Hill had not consented to the sexual contacts by “Jack,” that she had properly notified DSS and “Jack’s” therapist of “Jack’s” sexually inappropriate behavior, and that the Hills “had acted responsibly in attempting to stop the sexual acting out.” With regard to neglect, the Hearing Officer found that there was no evidence that any of the other children had been present during “Jack’s” sexual assaults on Mrs. Hill, and no evidence that these incidents had impacted the quality of care received by the other children.
The DSS Area Office involved in “Jack’s” case then requested a Commissioner’s review pursuant to 110 CMR 10.35.[8] With regard to the abuse issue, DSS contended that Mrs. Hill had not been forthcoming in her disclosures about “Jack’s” sexual activity. As to neglect, DSS argued that the Hills were aware of “Jack’s” sexual problems, that they had nevertheless allowed “Jack” to act as caretaker for the other children, and that two of the children had been sexually abused by “Jack.”[9]
On September 28, 1992, the Commissioner issued his decision, reversing the decision of the Administrative Hearing Officer and reinstating the initial decision to support the report of abuse and neglect and list the Hills in the Central Registry. The Commissioner reasoned that Mrs. Hill’s tolerance of “Jack’s” sexual attacks was sufficiently established to constitute “reasonable cause” that sexual abuse of “Jack” had occurred. With regard to neglect, the Commissioner found that “Jack” had been allowed to babysit for at least some of the children. “Allowing an adolescent, who is known or believed to have tendencies to sexually abuse children to serve as a babysitter is a failure to provide those children with minimally adequate supervision.”[10]
The present complaint for judicial review followed.
Discussion
In a G.L.c. 30A, §14 review, the agency’s decision must be upheld unless it is flawed by one of the specifically enumerated legal defects set out in the statute. Where the agency has acted in accordance with its governing statutes and regulations, and where there is “substantial evidence” to support its decision, the court is to affirm the decision, even though the court might have reached a different conclusion had it been hearing the matter de novo. Under these standards, the court is not to substitute its own judgment for that of the agency, and the court must give due deference to the agency’s expertise in the subject matter.
DSS’ decision to support the allegation of neglect and to list the Hills as alleged perpetrators of neglect in the DSS Central Registry satisfies the standards set forth in G.L.c. 30A, §14. The administrative steps taken were in accordance with agency regulations, including the hearing and administrative review by the Commissioner.
With DSS’ decision to rescind the prior determination to support the report of sexual abuse, the only remaining issue is the agency’s decision to support the report of neglect.[11] The evidence of “neglect” may be slim, but it passes the minimal standard of the “substantial evidence” test. See G.L.c. 30A, §1(6).
Under DSS regulations, the definition of “neglect” includes “failure by a caretaker, either deliberately or through negligence or inability, to take those actions necessary to provide a child with minimally adequate . . . supervision, emotional stability and growth.” 100 CMR 2.00(35). The evidence on which the Commissioner based his decision to support the report of neglect was evidence that the Hills, with full knowledge of “Jack’s” sexual propensities and knowledge that he had sexually abused foster children in his prior placement, left him alone as a babysitter for the young children (both their own and other foster children) in the Hill home. In the Commissioner’s view, this was less than “minimally adequate supervision” of the children.
The Hills denied that they left the children alone. However, “Jack’s” own interview makes clear reference to babysitting for the other children. The Hills’ five-year-old daughter also told the interviewer that “Jack” babysat for them. There is evidence in the record to support the factual conclusion that “Jack” was left alone as babysitter with at least some of the children. There is no evidence as to exactly when this occurred, or how frequently, but there is evidence that it happened on more than just one occasion. Given that the Hills knew, sometime shortly after “Jack” arrived in 1989, of “Jack’s” sexual problems and history of abusing other children, the record would also support the inference that these babysitting episodes occurred at a time when the Hills knew or should have known of the risk of leaving “Jack” alone with younger children.[12]
The question as to whether those unspecified instances of leaving “Jack” alone with the children amount to less than “minimally adequate supervision” is a matter of judgment. The judgment of the agency, with due regard for its expertise in the care of children, must be respected. In the ordinary sense of the words, “minimally adequate supervision” certainly includes the supervision necessary to keep children away from situations involving high risk of harm. Given “Jack’s” history, and his demonstrated inability to control his sexual impulses while in the Hill household, leaving him alone in charge of young children exposed them to an unacceptably high risk of harm. With regard to at least two of the children, there is reason to believe that that risk materialized into actual harm. The agency’s determination that the care of the children fell below minimally adequate supervision will not be disturbed by this court.
The Hills argue, with considerablejustification, that they are being blamed for DSS’s own inaction on *65 “Jack’s” case. While DSS tries to blame the Hills for advocating to keep “Jack" in their home, it was DSS, not the Hills, that had control over “Jack’s” placement. In many respects, the troubling events at issue in this case are as much DSS’s fault as they are the Hills. It is indeed disturbing that DSS, which also knew of Jack’s history and propensities, continued to place other foster children in the same home, and approved “Jack’s” placement there knowing that there were young children in the house. There is something fundamentally unfair about DSS placing a deeply troubled teenager in a foster home with young children and then blaming the foster parents for the fact that the children have been exposed to that risk. But for the evidence of “Jack” being allowed to babysit the children, a decision made by the Hills themselves that further increased the risks inherent in “Jack’s” placement in their home, the report of neglect could not be supported on this record.
ORDER
For the foregoing reasons, the Commissioner’s decision to support the report of neglect and to list Regina Hill and Stephen Hill on the Central Registry is AFFIRMED.

Jack” is a fictitious name used in this opinion to protect his identity.

“Jack’s” father was Mrs. Hill’s brother, by then deceased, and she felt some familial obligation to care for him. She also explained that she was concerned he would simply repeat his sexually assaultive behavior in another placement if he were moved.

DSS was also presumably aware of “Jack’s” previous history, a history that included extensive sexual abuse of “Jack” by his mother’s boyfriends, and his own history of perpetrating sexual assaults (including sexual abuse of other children) at his prior placement.

The worst of the episodes had occurred at night, when Mr. Hill was out of the house on his night shift. Most of them involved “Jack” entering Mrs. Hill’s bedroom while she was asleep and alone. Mrs. Hill would then awake as “Jack” attempted to climb on top of her and/or to penetrate her mouth with his penis. Having “Jack” stay with his grandmother on those nights when Mr. Hill was away at work was intended to keep him separate from Mrs. Hill during those late night hours.

Mrs. Hill ultimately pressed criminal charges against “Jack” for these sexual offenses. At the time of DSS’s investigation, those charges were still pending.

fio “support” a report means that DSS “has reasonable cause to believe that an incident (reported or discovered during the investigation) of abuse or neglect by a caretaker did occur.” 110 CMR 4.32(2).

When a report of abuse or neglect has been “supported,” DSS may list the identity of an alleged perpetrator of neglect or abuse in its Central Registry if “during the report and/or investigation, the individuals were alleged to be responsible for the abuse or neglect and there is no information to definitely indicate otherwise; and in the judgment of the investigator, the allegations with regard to the individuals should be further considered during the case management, or the allegations cause protective concerns about the individuals as a caretaker.” 110 CMR 4.33(1). The Registry is not a record open to the public, but rather a confidential DSS resource that can be consulted by the agency itself for future management, placement, adoption, and employment purposes. A listing is not an automatic disqualification, but serves as a “red flag” to the agency warranting a closer look at the individual if his or her name comes up as a potential foster placement, adoptive parent, or DSS employee.

Under current regulations, no such further review is available. Back in 1992, a party who lost at the administrative hearing could seek further administrative review by the Commissioner or his designee.

The Administrative Hearing Officer did not make any findings as to whether “Jack” had been left alone with any of the children as a babysitter.

The Commissioner also found that the Hills had not placed locks on the bedroom doors of the other children. (Only the Hills’ teenage daughter had a lock on her door.) The Commissioner’s analysis of the “neglect” issue was based solely on the evidence of “Jack’s” babysitting, without any reference to the lack of locks on the children’s bedrooms. The notion that infants and small children must be kept locked in their rooms at night (with all the increased risks that that entails in the event of accident, illness or sudden emergency) is troubling in the extreme. Despite the deference that must be shown to an agency’s expertise, the court would have grave doubts about upholding DSS’s decision if it had been based on the Hills’ decision not to lock their children in their rooms.

 Nhe Hills do not dispute that, if the report is properly supported, DSS could proceed with the listing in the Central Registry. If there is reasonable cause to believe that the Hills have perpetrated neglect on one or more children, it is certainly appropriate for DSS to be able to retrieve that information when making decisions involving the Hills in the future.

When the Hills’ daughter was interviewed in 1992 on the subject, she was five years old. She referred to “Jack” babysitting for them when her mother was not at home. If this babysitting had stopped back in 1989, when the Hills first became aware of “Jack’s” sexual history, it would not be expected that this child witness would remember any such babysitting, as she would have been only two years old at the time. This further supports the inference that “Jack’s” babysitting occurred long after the Hills knew of the danger he posed.